## THOMAS–BONNER CO. v. HOOVEN, OWENS & RENTSCHLER CO.

(District Court, S. D. Ohio, W. D. August 23, 1920.)

No. 2557.

1. **Courts ⬅343—Federal courts follow Code provisions in actions at law.**

   By virtue of the practice conformity statute, the rule requiring actions to be brought by the real party in interest prevails in actions at law in the federal courts sitting in Code states.

2. **Assignments ⬅121—Assignee may or may not be real party in interest.**

   Whether the assignment of a contract makes the assignee the real party in interest and vests in him the right to prosecute an action thereon in his own name depends on the terms and nature of the contract.

3. **Assignments ⬅3—Assignability of contract not affected by practice Codes.**

   A code provision requiring actions to be brought in the name of the real party in interest makes nothing assignable that was not so before its adoption.

4. **Assignments ⬅121—When assignee is real party in interest.**

   Under Code provisions requiring actions to be prosecuted in the name of the real party in interest, whenever a thing in action transferable by law is absolutely assigned, so that the ownership passes to the assignee, without conditions or reservations, and the legal or equitable claim is fully vested in him, he is the real party in interest, and suit must be in his name.

5. **Assignments ⬅19—Executory contract for personal services held not assignable without consent of other party.**

   An executory contract by which defendant made a partnership its general agent within a designated territory to demonstrate, introduce, and sell a new mechanical invention requiring skill in its operation, which contained provisions making it clear that defendant relied on the experience, salesmanship, and financial responsibility of the partners, who contracted to devote their personal services to the work, *held* not assignable to a corporation without defendant's consent.

6. **Contracts ⬅316(1)—Continued performance waiver of breach.**

   An assignee of an executory contract cannot maintain an action for an alleged breach before the assignment, where no such claim was made at the time, and both assignor and assignee continued performance.

At law. Action by the Thomas-Bonner Company against the Hooven, Owens & Rentschler Company. Judgment for defendant.

Irving A. Fish, of Milwaukee, Wis., and Edw. P. Moulinier, of Cincinnati, Ohio, for plaintiff.

Floyd C. Williams and Stanley Shaffer, both of Cincinnati, Ohio, for defendant.

SATER, District Judge. At the conclusion of all of the evidence both parties moved for a directed verdict. Judge Hollister took the case under advisement. In due course, after his sudden death, it reached me for disposition as a part of his unfinished work.

For some time prior to April, 1915, the defendant had been endeavoring to construct for marketing a patented automatic typewriter. In the April issue of System, a magazine, the defendant advertised for 17 big caliber men as sales managers to introduce its new appliance, which managers were to measure up to the following standard:

"First. They must be experienced in the organizing and handling of a selling force, made up in turn of high-grade men.

"Second. They must have strong personality—be able to meet 'man to man' the biggest business men of this country and put our proposition before them.

"Third. They must be men of record—able to show results in the past. We don't want 'comers'—we want men of proved ability.

"Fourth. We want men who have some money—not that we need another dollar for the financing of our product, but simply that we consider men who have made money and saved money best suited for our work."

Applicants were requested to communicate to Roberts, the defendant's sales manager, their financial ability and the whole story of their accomplishments in a business way. On April 3 a letter went forward to Roberts, signed "The Thomas-Bonner Co., C. A. Bonner, President," in which the belief was expressed that "our firm" measures up to the four above-mentioned standard requirements, and gave the information that the firm's business was that of manufacturers' agents, that it represented in Wisconsin and the upper peninsula of Michigan two high-class articles, one an adding machine, and that it was prepared to take on the agency for another really meritorious article and put out high-class salesmen to market it successfully. On April 23, in a letter containing somewhat fulsome praise of the new device, Roberts stated the results obtainable by its use and that the machine would do the work of five typists. He announced that the defendant was conservative and would adhere to its usual method of selecting men; that it made the men selected a part of itself and of its permanent force, having made only one or two changes in its sales force in 20 years; that exceptional growing men of proven work, who are master salesmen, were wanted; that, instead of opening branch offices of its own, it would select proper men, furnish them with machines, allow them to open their own offices, and pay them a handsome commission; and that, if a desirable applicant of creditable record could show financial strength sufficient to open up and maintain an office, and ability to carry on business successfully, the defendant would be willing to enter into a contract with him. Able men, and not money, it was stated, was what the defendant desired.

On April 29 C. A. Bonner by letter informed Roberts that he had

discussed the latter's proposition "with our sales manager and with Mr. E. D. Thomas, my partner," and asked for the form of contract proposed, on receipt of which he would then disclose "of what the Thomas-Bonner Company is made." Roberts' response was that, "if you or your business associate can come down" to Hamilton, the terms to be embraced in a contract would be thoroughly considered. The Thomas-Bonner Company desired the agency for the Milwaukee district, if allowed 30 days to pay for the machines it would be required to buy for demonstration. On May 12 the defendant, as party of the first part, and "the Thomas-Bonner Company, composed of C. A. Bonner, E. D. Thomas, and C. R. Thomas, of Milwaukee, Wisconsin, party of the second part," executed a contract, the signatures to which are "The Hooven-Owens-Rentschler Company, by C. E. Hooven, Treas.," and "The Thomas-Bonner Co. (party of the second part), C. A. Bonner, Pres't, E. D. Thomas, Secty." The duties, in so far as need be noted, imposed on the Thomas-Bonner Company, were:

"First. Diligent effort on the part of the party of the second part, in effecting sales of the Hooven automatic typewriter.

"Second. Said second party agrees to devote his entire time to the work of and incidental to making sales of the Hooven automatic typewriter.

"Third. The delivery and installation of said typewriters and accessories in the offices or place of business of the purchasers of same.

"Fourth. The proper instruction of person or persons, designated by purchasers, to learn the operation and care of the Hooven automatic typewriter and its accessories.

"Fifth. The taking care of and adjusting, also making repairs necessary when called upon to do so by purchasers, during the life of the guaranty, without charge to the purchaser.

"Sixth. The handling of all detail and clerical work connected with and incident to the proper operation of the district office."

The company was further obligated to demonstrate the automatic typewriter and its accessories in a suitable office or salesroom; to employ a suitable person to make adjustments and repairs to such typewriter and accessories when called upon by purchasers or users in its district to do so, and to make no charge for such services or repairs made and parts furnished within such district during the period covered by the defendant's guaranty to purchasers or users, all necessary tools and parts required to maintain the required service to customers and to carry out the service guaranty to be furnished by the defendant; to abide by the selling rules or regulations of the defendant as issued from time to time, under penalty of forfeiture for violation on a 10-day written notice; to install in its office or salesroom two typewriters and their accessories for demonstration purposes and to pay for the same; to maintain the selling price of the typewriter as fixed by the defendant and to offer no discount, rebates, or other inducements that would affect the selling price, under penalty in case of violation, of forfeiture of the contract on 10 days' written notice; and to make at least six bona fide sales of typewriters each month, and on failure to do so the defendant might exercise the reserved privilege of canceling the contract on 60 days' written notice. The defendant agreed to do all advertising for the introduction of the device, furnishing the company, without charge, all pamphlets, catalogues, book-

lets, and other literature produced from time to time; to furnish without expense to the company all letter heads, envelopes, and other printed stationery necessary for the agency's business; to deliver to the company typewriters and accessories required by bona fide orders taken on sales order blanks furnished by defendant; to make all collections, "etc.," in connection with sales of typewriters made by the company, the company, however, to assist whenever possible in effecting prompt collection on accounts made in its territory; to pay a 25 per cent. commission on all sales made by the company which were accepted by the defendant; to help the company in every possible manner in building up a profitable and satisfactory business; and to furnish the company with the names of inquirers about the machine and to make no sales within the company's district, except as a commission is paid to the company. In case of a disagreement between the parties, the company was to resell the two machines purchased by it to defendant at the price which the company paid defendant for the same. The contract was to remain in force from year to year, if the company complied with its terms.

From the foregoing it is clear that the defendant corporation knowingly contracted with the Thomas-Bonner Company as a partnership. The petition charges and the answer admits that the company was a partnership when the contract was made. Bonner's first letter apprised Roberts that he was writing for a "firm." The word "firm" is synonymous with "partnership." Bouvier's Law Dict. title "Firm"; 3 Words and Phrases Jud. Def. 2820. His letter of April 29 told Roberts that Bonner and E. D. Thomas were partners. The mention in Roberts' letter of Bonner's "business associate" shows that he recognized that he was dealing with a partnership. The contract, when executed, brought to the defendant's knowledge the existence of a third partner. From examination of the handwriting of the signers and of the written portions of the contract, taken in connection with Roberts' letter of May 12, the conclusion seems necessarily to follow that all of such written portions were inserted in the printed forms at Hamilton, Ohio, before the two copies were sent to Milwaukee, and that the defendant consequently knew, before the contract was drawn, the names of all of the partners. Were it not so, it is not probable that the company would have been requested to return to Hamilton but one copy of the executed contract.

Importance cannot be rightfully attached to the fact that the party of the second part is referred to in the contract by the pronoun "his," instead of "its," or "their." The contract is on a printed form, prepared on the theory that it would be used in dealing with a single individual. The manifest intention of the parties cannot be overthrown by their nonobservance of a grammatical error. The contract pledged the entire time of the firm, and consequently of the individuals composing it, to the making of sales of the typewriter and to the work incidental thereto. That the parties thus understood their contract is further evidenced by Exhibits 17, 18, and 19.

Carl R. Thomas, in May and early June, spent three weeks at Hamilton, Ohio, in attending an instruction school conducted by defendant at its plant, to acquaint him and 18 other agents with the machine

"and the selling end." The purpose of the school was the training of good managers or salesmen, for "to be a first-class salesman * * * you had to know about the factory business, the machine itself, and the parts of it." It was for this reason Thomas pulled the machine apart and reassembled it, which, when so reconstructed by him, was operative. He so familiarized himself with the device's simple parts that he could adjust a machine, if something went wrong about it, but with considerable difficulty. In the matter of adjustment he was given, so he states, "competent instructions," and, when unable to proceed, was assisted by the factory men. Occasionally he operated a machine. Several of them were completed and in operation more or less of the time, to all of which he had access. He saw the device operated satisfactorily. It would "stop once in a while, but a little adjustment would fix it; we gave it no thought." Parhn, who worked at the school alongside of Thomas, makes the defective operation of the machines more serious. He states that in his and Thomas' presence for two or three days at a time the pins would bend or break, lines would be misspaced, clutch trouble would occur, bands and springs would break, and the carriage return mechanism would operate defectively; the machine trouble being such as to cause comment by all of the 19 salesmen.

The first machine shipped to the Thomas-Bonner Company was for demonstration purposes and was forwarded June 24. It was put into use not later than the 27th. On the 28th the defendant sent Cornelson to instruct some one to be chosen by the Thomas-Bonner Company to act as demonstrator. On June 18 the members of the firm and Mahoney (and, according to the defendant's brief, Niemyer also) took steps to form a corporation to be known as the Thomas-Bonner Company, and on June 29 a certificate of incorporation was issued to such company by the Wisconsin secretary of state. The stockholders were the members of the firm and Mahoney. Whether Niemyer was also an incorporator and stockholder I am not able to determine, for the reason that Exhibits 1, 2, and 3 have not come into my possession. The extent of each stockholder's holdings does not appear. The firm assigned all of its business and affairs, rights, contracts, and assets, including its contract with the defendant and its liabilities thereunder, to the corporation, and in so far as such firm was able to do so made the corporation its successor in all of the partnership business. The corporation was authorized to sell, not only automatic typewriters, but office and electrical supplies. No notice was given to the defendant of the firm's assignment of its contract to the corporation. The defendant's first knowledge of the existence of such corporation and of the firm's assignment of its contract to it was acquired after the petition was filed in this case.

Carl R. Thomas set up the machine shipped to Milwaukee in June. On account of difficulty encountered, Cornelson on June 28 went to that city and remained there a week. He was not very long in getting the machine to run, and such trouble as occurred during his visit called only for minor adjustments. After his departure the typewriter would get out of order. It would, for instance, skip the space of a

line, or a spring or carriage band would break. The difficulties encountered appear in detail in the correspondence which passed between the parties to this action. When properly adjusted, the machine worked satisfactorily. The contrast between Thomas' evidence and that of Bonner as to the operation of the machine at Milwaukee is quite as marked as that between his and Parhn's evidence as to observable difficulties at Hamilton. Cornelson found the machine at Milwaukee all right, outside of the little needed adjustment. It was in operation every day he was there, but he used it but little. Miss Nee was the only one to whom he gave instructions. The Thomas-Bonner Company did not succeed in operating successfully any machine sent it, and in consequence placed but one, and that proved a failure. During the activities of that company the defendant placed a number of machines which worked successfully and with the need of only slight occasional adjustments. Beneficial changes in certain parts of the device were effected; the change, however, not being in the functions performed. That the typewriter is an operative and commercial success seems clear.

The conclusion which I have reached is that the Thomas-Bonner Company never sufficiently mastered knowledge of the machine to keep it in steady running order. Carl R. Thomas was the only member of the firm that took instruction from a competent person. His information was not thorough. I am also of the opinion that the machine sent to Milwaukee was not so perfectly constructed as were those upon which changes in certain respects were installed, and that such fact contributed to the difficulties encountered by the firm. The defendant caused some of its typewriter parts to be manufactured for it elsewhere, which it elected to discard. The Milwaukee machine may not have been up to standard. I am disposed to think there was fault on both sides. The letters of the Thomas-Bonner Company recite the difficulties encountered. They also speak at times of the machine's satisfactory working and of their great confidence in it as a successful invention. The company at all times clung to and expressed the desire to continue the agency. On October 30 it notified the defendant that after November 5 Carl R. Thomas "will not be connected with this company," and asked to know "where we stand." On November 1 the company by wire requested the defendant to state its position. On November 6 the defendant answered that, if it could be shown that some one could be secured to handle the proposition, it would be glad to continue the agency. On November 9 the defendant asked Bonner to advise what was intended about continuing as the defendant's representative, and was informed on November 15 that a continuance was desired. On December 3 the defendant wrote the company as follows:

"According to the terms of your contract you are to maintain your own service department by employing some one competent to take charge of same. This you have not done. Further, we have received just one order from you since you started in with the proposition. Therefore this is to inform you that, unless you are able to show some ability to sell the number of machines called for in your contract, we will have to cancel same. We will be glad to furnish you with a man who is able to take care of your service department at $15 to $18 per week."

Other correspondence followed, and on February 10 the defendant canceled the contract. The only claim pressed by the plaintiff is that it ought to recover $10,800, being the commissions which it asserts it could and would have earned in a year on the sale of 72 machines (six per month), had the device been operative and the contract continued for that period. The defense rests on the nonassignable character of the contract.

[1, 2] The plaintiff relies on the provision in the statutes of both Wisconsin (section 2605, Wis. Stat. 1911) and Ohio (section 11241, G. C.) that, subject to certain exceptions here immaterial, an action must be prosecuted in the name of the real party in interest. By virtue of the practice conformity act the rule requiring actions to be brought by the real party in interest prevails in actions at law in the federal courts sitting in the Code states. 15 Ency. Pl. & Pr. 709; Arkansas Valley Smelting Co. v. Belden Co., 127 U. S. 379, 387, 8 Sup. Ct. 1308, 32 L. Ed. 246. Whether the assignment of a contract makes the assignee the real party in interest, and vests in him the right to prosecute an action in his own name, depends on the terms and nature of the contract (American Bonding & Trust Co. v. B. & O. S. W. R. Co., 124 Fed. 866, 60 C. C. A. 52 [C. C. A. 6]); the vital question being (and it is the big one here) whether the contract is in fact assignable (Arkansas Valley Smelting Co. v. Belden Co., 127 U. S. 387, 8 Sup. Ct. 1308, 32 L. Ed. 246). Real party in interest does not mean one who will be affected by the judgement, but relates only to a legal interest, or one which would have been recognized either at law or in equity before the Code. 1 Bates, Pl. & Pr. 8.

[3, 4] The Code made nothing assignable that was not so before its adoption. Hodgman v. Western R. Co., 7 How. Prac. (N. Y.) 492, cited in note to section 2605, Wis. Stat. 1911. The only interpretation that can be placed upon the language that an action must be prosecuted in the name of the real party in interest is that, whenever a thing in action transferable by law is absolutely assigned, so that the ownership passes to the assignee, without conditions or reservations, and the legal or equitable claim is fully vested in him, he is the real party in interest, and must sue in his own name. Gruber v. Baker, 20 Nev. 453, 23 Pac. 858, 9 L. R. A. 302, 305. That there are contracts which are not assignable without assent of both parties is the law of both Wisconsin and Ohio. Varney v. Bartlett, 5 Wis. 276, 278; Johnson v. Vickers, 139 Wis. 145, 120 N. W. 837, 21 L. R. A. (N. S.) 359, 131 Am. St. Rep. 1046; Chapin v. Longworth, 31 Ohio St. 421. We must look to the nature and terms of the instrument under consideration.

[5] The contract is executory. An executory contract for personal services, or a contract otherwise involving personal credit, trust, or confidence, cannot be assigned by one of the parties thereto, so as to compel the other party to accept performance by the assignee. Clark on Contracts, 364; American Bonding & Trust Co. v. B. & O. S. W. R. Co., 124 Fed. 872, 60 C. C. A. 52; Johnson v. Vickers, 139 Wis. 148, 120 N. W. 837, 21 L. R. A. (N. S.) 359, 131 Am. St. Rep. 1046; 4 Cyc. 22, 23; Page on Contracts, § 1262; Sloan v. Williams, 138 Ill. 43, 27 N. E. 531, 12 L. R. A. 496, 497; Chapin v. Longworth, 31 Ohio

St. 421; Edison v. Babka, 111 Mich. 235, 238, 69 N. W. 499. In Delaware County v. Diebold Safe & Lock Co., 133 U. S. 473, 488, 10 Sup. Ct. 399, 404 (33 L. Ed. 674), the rule is stated to be that:

"When rights arising out of contract are coupled with obligations, to be performed by the contractor, and involve such a relation of personal confidence that it must have been intended that the rights should be exercised and the obligations performed by him alone, the contract, including both his rights and his obligations, cannot be assigned without the consent of the other party to the original contract. Arkansas [Valley Smelting] Co. v. Belden [Mining] Co., 127 U. S. 379, 387, 388."

The personal acts and qualities of the three partners were material ingredients of the contract. Their engagement was for their personal services, requiring skill and peculiar qualifications, which they agreed to devote entirely to the marketing of defendant's device. The defendant contracted with them to assist in launching a new and important enterprise, by reason of the trust and confidence placed in them personally as men and skilled salesmen, and to a considerable extent on account of their financial ability and integrity, for they were to finance their agency and also to assist whenever possible in effecting prompt collections of all accounts due in their territory. This would seem to involve the measurable handling of the defendant's funds. The typewriter was a new, delicate, high-speed, and somewhat complex mechanism, requiring proper care and accurate adjustment to do its work efficiently. An operator ill trained and of erratic touch will fail to get an even movement of its operative parts, and consequently the work of which it is capable. Even the employment of the right kind of paper, rightly adjusted and thus maintained, is important to its successful use.

The burden of selecting a suitable employee to instruct operators in the use of the machine was undertaken by the partners. The responsibility for the training of such instructor was cast upon and assumed by them. The important and delicate task of demonstrating the machine to prospective purchasers was theirs. Its character and the necessity of creating a favorable impression on its first introduction to interested inquirers and the public were such that it was demed necessary to teach salesmen "all the essence of ordinary adjustment" and "the elements of proper selling." A school of instruction was therefore conducted by defendant, in which sales agents were taught to disassemble and then to reassemble the device, that they might acquaint themselves with the device and its several parts, the office to be performed by each, and the manner of operation. Its successful and speedy operation, the demonstration of its utility and its economy producing qualities, its extensive and prompt marketing, its good reputation, and the profits to accrue to defendant, depended on successful salesmen and operators, acquainted with the device and its various parts, and capable of maintaining them in proper relation.

The defendant intrusted its business, and consequently the good name of itself and its novel device, in a large and attractive territory, to the personal diligence and skill of the partners. The fact that subsequently a service man was stationed at each sales agency to adjust out of order machines bespeaks the firm's difficult undertaking and the

skill which they stipulated to acquire and exercise. Their pledge of that skill is evidenced by their obligation of a financial nature, without charge to purchasers and at their own expense, to care for, adjust, and make repairs when called upon by purchasers so to do. They were selected as agents and empowered to act as such because they represented themselves to be and were believed to be energetic, resourceful, high-grade men, of strong personality, experienced in organizing and handling a high-class selling force. They were accepted on the theory that they were to remain with, and as growing master salesmen were to be made a part of, the defendant's organization. The defendant emphasized the kind of men it desired for its sales agencies and its intention to make its own selections.

By the terms of the contract the entire estates of the respective partners were financially bound for any loss or damage which the defendant might sustain through the agency. It could not be required without its consent to accept, as a substitute named by them, a corporation which did not propose to devote its whole time and energy to the sale of defendant's device, but which was chartered to conduct another line of business also. Whether Mahoney's holdings were such as to enable him to select the corporate board of directors does not appear, but the right to dispose of stock made possible the change of corporate control, and the foisting upon defendant of agents of other than its own selection, would strip it of the individual financial liability of the members of the firm, would remit it to the financial responsibility or irresponsibility, as the case might be, of a corporation, and defeat its purpose of building up a permanent efficient selling organization. The partners were not authorized by an assignment of their contract to transfer their financial obligations, or their other obligations to perform, to a third party, effect their own release, and defeat in important respects, and perhaps entirely, the intent of the contracting parties. The defendant contracted with reference to the character, credit, and substance of the members of the firm, and it had the right to the benefit it anticipated therefrom. Arkansas Valley Smelting Co. v. Belden Min. Co., 127 U. S. 379, 8 Sup. Ct. 1308, 32 L. Ed. 246. The reasoning in Harper v. Dalzell, Gilmore & Leighton Co., 27 Bull. 274, and Johnson v. Vickers, 139 Wis. at page 148, 120 N. W. 837, 21 L. R. A. (N. S.) 359, 131 Am. St. Rep. 1046, is pertinent. It must be held that the contract was not assignable.

[6] Nor is there merit in the contention that the defendant, by sending an imperfect machine to the firm in June, 1915, breached its contract, and thereby gave rise to a cause of action which was assignable, and was assigned to the corporation. If there was such a breach (which need not be determined), neither the firm nor the corporation availed themselves of it. On the contrary, the correspondence shows that they elected to treat and keep the contract alive, and without suggestion that it had been breached continued to operate thereunder; the defendant believing, however, all the while, that it was still dealing with a partnership, and the corporation and its members who had constituted the partnership insisting on maintaining and retaining the agency. The contract was canceled by the defendant. It was not renounced by either the partners or the corporation. The failure to elect

284 F.—25

to renounce defeats the contention made.   3 Page, Contracts, § 1494; Tickler v. Andrae Mfg. Co., 95 Wis. 352, 70 N. W. 292; Pratt v. Freeman, 115 Wis. 648, 660, 92 N. W. 368.

The Wisconsin cases cited by plaintiff are easily distinguished.   In Hanrahan v. Janesville, 145 Wis. 457, 130 N. W. 482, it was expressly stated 'that all the work required to be done under the contracts was done by the plaintiffs (the assignees) with the knowledge and consent of the defendant.   In Day v. Buckingham, 87 Wis. 215, 218, 58 N. W. 254, it appears that the claims upon which the assignees sued had accrued and become the basis of actions before their assignment occurred. State v. Hastings, 15 Wis. 83, went off on the principal that the salary of an officer to become due is a possibility coupled with an interest, and as such is capable of being assigned.   In Wisconsin, as elsewhere, in so far as I have been able to discover, the rule prevails that a contract is not assignable, unless by its terms and nature it is made so.

It follows, from the foregoing, that judgment must be entered for the defendant, and the case dismissed.